# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

DANIEL MARTIN,

     Plaintiff

v.

CLARK COUNTY, JOHN MARTIN, and
MARCUS MCANALLY,

     Defendants.

CLARK COUNTY,

     Counterclaimant,

v.

DANIEL MARTIN,

     Counterdefendant.

Case No.: 2:19-cv-01623-APG-DJA

**Order Granting Defendants' Motion for
Summary Judgment**

[ECF No. 48]

Plaintiff Daniel Martin (Daniel) worked as a Juvenile Justice Probation Officer at defendant Clark County's Department of Juvenile Justice Services (DJJS) where defendant John Martin (John) was the Director and defendant Marcus McAnally was a supervisor. Daniel was terminated from his job in August 2015 and reinstated in October 2015. In August 2016, Daniel brought a lawsuit against the defendants and additional parties. The parties settled that lawsuit and agreed to dismiss those claims in February 2017. Daniel was again terminated from his job at DJJS in January 2018.

Daniel then filed this suit against the defendants, claiming race discrimination, retaliation, and violations of his civil rights. The defendants now move for summary judgment on Daniel's claims. Daniel responds that he has raised genuine issues of fact whether he was treated less

favorably than similarly situated employees, whether the defendants' termination reasons were pretext, and whether his termination was retaliation.  Daniel also argues that he raises genuine issues on the extent of the individual defendants' own actions and decisions, and whether Clark County's policies denied him his rights.

Daniel has not raised a genuine issue of fact on his claims, and the defendants are entitled to judgment as a matter of law.  I therefore grant the defendants' motion for summary judgment.

## I.  FACTUAL BACKGROUND

Daniel worked for DJJS from approximately June 1997 until August 2015, and again from October 2015 until January 31, 2018. ECF No. 58-2 at ¶ 1.  He was a Juvenile Justice Probation Officer II (JPO) at the Clark County Juvenile Detention Center. *Id.*; ECF Nos. 48 at ¶ 1; 58 at ¶ 1.  His employment was governed by a collective bargaining agreement (CBA) that provided a system of progressive discipline. ECF Nos. 39 at 15-28; 48 at ¶¶ 2, 3; 58 at ¶¶ 2, 3.

*1.  Daniel's Internal Complaints*

Between March 2017 and December 2017, Daniel submitted numerous complaints to DJJS leadership (ECF No. 58-2) detailing the following alleged incidents:

- A cook, Kim Codebo, told a child in the kitchen serving line that Daniel needed to tell Codebo about the child's food allergies. *Id.* at 74.

- A supervisor, Christine Ochoa, requested to speak with Daniel privately. *Id.* at 77.

-  McAnally asked Daniel where his radio was. *Id.* at 62.

- A rumor that a director stated Daniel was a bad influence on other employees. *Id.* at 25.

- A rumor that Daniel and a co-worker had an interpersonal issue. *Id.* at 19.

-  An allegation that two officers conspired to get Daniel in trouble. *Id.* at 28.

- An officer, James Webb, cursed at Daniel after Daniel asked Webb to relieve him. *Id.* at 39.

- An allegation that McAnally was rude and unaccommodating. *Id.* at 25.

2. *August 2017 Serving Line Incidents*

As a JPO, one of Daniel's job duties was to ensure that children in the detention center went orderly through the serving line in the kitchen. ECF Nos. 39 at 11, ¶ 5; 48 at ¶ 5; 58 at ¶ 5. The cooks at the detention center prepared special meals for the children that had allergies or otherwise required special diets. ECF Nos. 39 at 11, ¶ 5, 38 (30:25-31:21); 48 at ¶¶ 7; 58 at ¶¶ 7. A special diet list detailed which children received those meals. *Id.*; ECF No. 40 at 168-170.  A copy of this list was placed at the front of the serving line in the kitchen during each meal. ECF Nos. 39 at 40 (38:10-19); 48 at ¶ 9; 58 at ¶ 9.  It was standard practice for a JPO to stand at the head of the serving line as the children received their meal trays. ECF Nos. 39 at 40 (39:14-40:2); 48 at ¶ 10; 58 at ¶ 10.  There are disputes regarding whether the JPO at the head of the line was responsible for consulting the list while at the head of the line or could do so prior to mealtime, and whether it was the JPO's responsibility to identify the child with a special diet and communicate with kitchen staff regarding any particular child. ECF Nos. 39 at 41 (43:1-21), 104; 40 at 174, ¶ 4; 48 at ¶ 11; 58 at ¶ 11.

On August 17, 2017, Daniel was at the front of the serving line during breakfast. ECF Nos. 39 at 111, ¶ 4; 42, video entitled "8-17-2021, breakfast, Kitchen serving line"; 48 at ¶ 12; 58 at ¶ 12.  McAnally, a supervisor, was near the front of the line as well. *Id.*; ECF No. 39 at 106.  Daniel did not consult the special diet list while stationed at the front of the line that morning.  ECF Nos. 40 at 83-84; 42, video entitled "8-17-2021, breakfast, Kitchen serving line." But he did so prior to being stationed at the front of the line. ECF No. 58-2 at 5, ¶ 11.

After the children went through the line, McAnally told Daniel that he needed to read off the special diet list to the cooks. ECF Nos. 39 at 39 (36:16-38:19, 41:22-42:4; 47:3-9); 40 at 81. Daniel reported this incident to a manager in an email with the subject line "Harassment." ECF Nos. 39 at 106; 48 at ¶ 15; 58 at ¶ 15.   DJJS policy requires JPOs to obey reasonable orders and directives given by supervisors. ECF Nos. 40 at 165; 48 at ¶ 16; 58 at ¶ 16.  Later, during an investigation into the August 24 incident described below, Daniel acknowledged that if a supervisor gave him an instruction or direction, he was supposed to follow it immediately, and that an officer could follow an instruction under protest if they felt it was detrimental to them. ECF No. 42, audio recording entitled "171019_001 martin" at 1:11:50-1:12:32; 1:13:00-1:14:00. He also acknowledged it would be acceptable for a supervisor to instruct him to read off the special diet list. ECF No. 42, audio recording entitled "171019_001 martin" at 1:13:15-1:13:37.

Six days later, Daniel was again stationed at the front of the serving line for both breakfast and lunch. ECF Nos. 39 at 111, ¶¶ 5, 6; 42, video entitled "08-23-2017 breakfast Kitchen serving line", video entitled "08-23-2017 lunch, Kitchen serving line."  Daniel consulted the special diet list prior to entering the dining hall, but he did not review the list while stationed at the front of the line during breakfast or lunch.  ECF Nos. 42, video entitled "08-23-2017 breakfast Kitchen serving line," video entitled "08-23-2017 lunch, Kitchen serving line"; 58-2 at ¶ 14.

The next day, August 24, 2017, Daniel was again stationed at the front of the serving line during breakfast. ECF Nos. 39 at 112, ¶ 7; 42, video entitled "08-24-2017 breakfast, Kitchen serving line"; 48 at ¶ 18; 58 at ¶ 18.  Jesse Navarro, the Duty Supervisor that day, was near the front of the serving line. *Id.*; ECF No. 40 at 174, ¶ 3.  A day or less prior, a child with diabetes had joined the unit Daniel was assigned to. ECF Nos. 40 at 169-70; 48 at ¶ 19; 58 at ¶ 19.  Daniel

contends that McAnally moved the child from his unit into Daniel's unit. ECF No. 58-2 at ¶ 16. The standard breakfast meal that day included sugary foods. ECF Nos. 40 at 172; 48 at ¶ 20; 58 at ¶ 20.  Daniel did not consult the special diet list while at the front of the serving line. ECF No. 42, video entitled "08-24-2017 breakfast, Kitchen serving line."  There is a dispute whether Daniel relayed information from the special diet list to the kitchen staff. ECF Nos. 40 at 174, ¶ 5; 58-2 at ¶ 17.  Daniel left the serving line area before the last of the children went through the line. ECF Nos. 39 at 44-45 (56:14-57:12); 42, video entitled "08-24-2017 breakfast, Kitchen serving line."  The diabetic child was later treated for elevated blood sugar levels. ECF Nos. 48 at ¶ 25; 58 at ¶ 25.

Five days later, Daniel met with his direct supervisor, Savanah Jaime. ECF Nos. 48 at ¶ 28; 58 at ¶ 28.  While in Jaime's office, Daniel signed a form which stated: "To relieve this [kitchen staff issue] do not position yourself at the front of the serving line.  Allow other staff to complete that duty . . . ." ECF Nos. 39 at 47-48 (68:10-69:13); 40 at 177.  There is a dispute whether the document included this statement at the time Daniel signed it, as well as whether this document constituted an order for Daniel to cease placing himself at the front of the serving line or a suggestion that he do so. ECF Nos. 39 at 50 (77:17-79:18); 48 at ¶ 28; 58 at ¶ 28.  Daniel was positioned at the front of the serving line in the dining hall the day after signing this document, and on September 4, 5, and 13, 2017. ECF No. 39 at 7.

### 3. Internal Investigation into August 2017 Serving Line Incidents

DJJS conducted an internal investigation into Daniel's alleged insubordination resulting in the August 24 incident involving the diabetic child.[1] ECF Nos. 48 at ¶ 35; 58 at ¶ 35.  The

---

[1] Daniel argues that his representatives during interrogations were interfered with in violation of Nevada Revised Statutes § 289.080(3).  Daniel has not raised this claim in his second amended complaint, so I do not address it.

investigation was based on allegations that Daniel presented a safety risk to children, was

insubordinate, failed to follow instructions, and failed to follow DJJS procedures on August 17,

23, and 24. ECF No. 42, audio recording entitled "171019_001 martin" at :30-1:02.  DJJS's

procedure for investigating allegations of misconduct provides that an employee's refusing to

cooperate during an internal investigation or knowingly giving false or misleading information

are grounds for immediate termination. ECF Nos. 40 at 180; 48 at ¶ 33; 58 at ¶ 33.  The

investigators interviewed Daniel on October 19, 2017. ECF Nos. 39 at 114, ¶ 15; ECF No. 42,

audio recording entitled "171019_001 martin."  Daniel was advised and acknowledged in writing

and verbally at the beginning of the interview that dishonesty during the interview would be

grounds for termination. ECF Nos. 40 at 184; 42, audio recording entitled "171019_001 martin"

at 2:00-2:54; 6:21-6:34; 48 at ¶ 37; 58 at ¶ 37.  During the interview, Daniel stated it was other

officers' responsibility to place the diabetic child at the back of the line. ECF No. 42, audio

recording entitled "171019_001 martin" at 55:25-55:50; 56:15-56:40.  He also stated that once

he and the children were in the dining hall, and the line had proceeded until the children with

allergies were near the front, Daniel picked up and looked at the special diet list and asked

another officer where the diabetic child was, and was told the child had already eaten. ECF No.

42, audio recording entitled "171019_001 martin" at 55:50-56:14, 1:01:28-101:33.

Daniel was interviewed again on December 7, 2017 and was again told that providing

false or misleading information during an internal investigation was grounds for immediate

termination. ECF No. 42, audio recording entitled "171207_001 martin" at 1:10-1:23.  Daniel

was interviewed again on December 11, 2017.  This interview was based on an allegation that

Daniel was untruthful or evasive in his statements to investigators on October 19 and to address

follow-up questions from the October 19 interview. ECF No. 42, audio recording entitled

1  "Daniel Martin - 171211_0005 martin" at :00-2:03.  Daniel again acknowledged that

2  untruthfulness during an investigation was grounds for termination. *Id.* at 4:10-5:06.

3       During the investigation, the diabetic child stated that on one occasion while in the

4  serving line, a tall African-American male officer with glasses got into an argument with kitchen

5  staff in the dining hall. ECF No. 40 at 190.  The child stated that the kitchen staff was not

6  listening when the officer told the staff that the child was diabetic and the cook had given him

7  the wrong meal tray. *Id.*  The child did not provide the date of this incident. *Id.*

8       The investigation concluded that Daniel was insubordinate on August 17, 24, and 30, and

9  September 4, when he disregarded McAnally's direction to read from the special diet list, and on

10  August 30, September 4, 5, and 13 when he disregarded his supervisor's direction to not work

11  the front of the serving line. *Id.* at 221.[2]  The investigation further concluded Daniel's not

12  reading from the special diet list on August 24 endangered children with allergies or special

13  diets. *Id.*  Finally, the investigation concluded that Daniel was untruthful to investigators at

14  various points in the investigation, including in his statement that he read from the special diet

15  list while at the front of the serving line on August 24. *Id.* at 228.

16       *4.  Daniel's Absence Without Leave*

17       DJJS Standard Operating Procedures state that staff will not call for food delivery to be

18  eaten in Detention Services or leave the facility to get food. ECF No. 41 at 7.  DJJS considers

19  absence from duty without approved leave to be grounds for discipline or termination. ECF No.

20

---

21  [2] Daniel argues DJJS's Report and Investigative Findings from January 16, 2018 is inadmissible
   hearsay.  On a motion for summary judgment, a party may object that material cited cannot be

22  presented in a form admissible at trial. Fed. R. Civ. Pro. 56(c)(2).  Evidence considered at
   summary judgment does not have to be in admissible form, but the content of the evidence must

23  be admissible. *Fraser v. Goodale*, 342 F.3d 1032, 1036-37 (9th Cir. 2003).  The investigators
   could testify at trial as to their conclusions.  Therefore, I will consider the investigator's
   conclusions.

40 at 181.  Daniel left his work area on September 21, 2017 to get food. ECF No. 41 at 80.  An investigation concluded that Daniel did so without permission. *Id.* at 81.  Former DJJS officers stated that, in their experience, it was common practice for officers to briefly leave the workplace to purchase food in between working double shifts, as Daniel did. ECF Nos. 58-3 at ¶ 24; 58-5 at ¶ 20.

### 5.  Daniel's Termination

Daniel was recommended for termination on January 18, 2018 for his disregard for youth medical safety, failing to provide accurate and truthful statements during an internal investigation, insubordination, and absence from duty without approved leave. ECF No. 41 at 43.  Michael Whelihan, DJJS Assistant Director, along with Carolyn Banks and Dean Steiner, both Managers at the Detention Center, issued the recommendation for termination. ECF No. 39 at 13, ¶ 17.  According to Whelihan, John Martin delegated the matter of Daniel's actions at the head of the serving line to Whelihan to address. ECF No. 39 at 12-13.  John played no active role in the decision to terminate Daniel but was informed of the decision. *Id.*  John stated that with regard to his role in the decision to terminate Daniel, he approved the decision to recommend termination based on the information Whelihan would give him but did not recall meeting with Whelihan regarding the decision. ECF No. 41 at 19 (28:24-29:25).  John delegated his authority to sign off on Daniel's "termination paperwork" to Whelihan. *Id.* at 19 (29:5-25) - 20 (30:1-14).  McAnally was interviewed during the investigation into Daniel's conduct but did not participate in any meetings or discussions during which Daniel's termination was discussed. ECF No. 40 at 94.

Daniel received a copy of the recommendation for termination on January 18, 2018. ECF Nos. 39 at 57; 41 at 48.  He was placed on administrative leave that day. *Id.*  Dean Steiner, a DJJS manager, Mark Marumoto, a DJJS supervisor, Rashaad Thomas, a JPO, and Patrick Kelso,

a JPO, were present when Daniel received the recommendation for termination. ECF Nos. 39 at 54, 57-58; 41 at 18, 48.

Brett Allen, a DJJS manager, upheld the decision to terminate Daniel at a hearing held on January 31, 2018. ECF Nos. 39 at 58 (110:11-112:13); 41 (44:12-45:19).  Drew Christensen, Director of the Office of Appointed Counsel, subsequently affirmed the decision. ECF Nos. 39 at 62 (127:14-128:10); 41 at 24 (47:4-48:12).  An arbitration regarding Daniel's termination was scheduled for July 2018, but Daniel withdrew his arbitration request. ECF Nos. 39 at 80 (197:14-22); 41 at 24 (48:16-49:1).

### 6. *Current Claims and Motions*

Daniel asserts five causes of action against the defendants arising out of his employment and termination.  Daniel asserts two claims against Clark County only: (1) Clark County violated Title VII and Nevada Revised Statutes (NRS) Chapter 613 by discriminating against him based on his race, and (2) the County retaliated against him in violation of Title VII.  Daniel asserts three claims against all defendants.  He asserts a claim under 42 U.S.C. § 1983 that the defendants violated his rights to equal contractual relations.  And he asserts two claims under 42 U.S.C. § 1981, one of which alleges race discrimination and hostile work environment and another that alleges retaliation.

The defendants move for summary judgment on all of Daniel's claims.  They argue Daniel cannot show that similarly situated individuals were treated more favorably than him.  They contend they had a legitimate reason for terminating Daniel.  They argue Daniel cannot show a racially hostile work environment.  With regard to Daniel's retaliation claim, the defendants argue they had legitimate reasons to terminate him, and the timing between termination and Daniel's filing a prior lawsuit against the defendants is too remote to infer

causation.  The defendants also argue Daniel cannot raise a genuine issue of material fact to support his § 1983 claim.  They finally argue that John and McAnally were not personally involved in the decision to terminate Daniel and are otherwise entitled to qualified immunity.

Daniel responds that he was treated less favorably than similarly situated employees, and that the defendants' reason for terminating him for insubordination is pretext.  He argues McAnally and DJJS were motivated to retaliate against him, and that discrimination and retaliation more likely motivated his termination.  With regard to his retaliation claim, Daniel argues a jury could reasonably infer causation from the temporal proximity between his settling the prior lawsuit and his termination.  He contends McAnally was intimately involved in the decision to terminate him, and that DJJS tolerated McAnally's retaliatory harassment of Daniel. Daniel argues a jury could find Clark County's policies denied him his right to his DJJS employment, and so could find in his favor on his § 1983 claim.  Finally, he argues John and McAnally are individually liable under § 1981 because of their own actions, and they cannot claim qualified immunity because supervisors cannot engage in discrimination or retaliation.

## II. ANALYSIS

Summary judgment is appropriate if the movant shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*  The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The burden then shifts

to the non-moving party to set forth specific facts demonstrating there is a genuine issue of material fact for trial. *Sonner v. Schwabe N. Am., Inc.*, 911 F.3d 989, 992 (9th Cir. 2018) ("To defeat summary judgment, the nonmoving party must produce evidence of a genuine dispute of material fact that could satisfy its burden at trial.").  I view the evidence and reasonable inferences in the light most favorable to the non-moving party. *Zetwick v. Cnty. of Yolo*, 850 F.3d 436, 440-41 (9th Cir. 2017).

### A.  Race Discrimination Claims

The defendants argue they are entitled to summary judgment on Daniel's race discrimination claims brought under Title VII, NRS § 613.330, and 42 U.S.C. § 1981 because Daniel has no direct evidence of discrimination, and he failed to identify any similarly situated individual who received more favorable treatment than he did.  The defendants argue that the comparators Daniel identifies are not similarly situated because those individuals did not engage in similar discipline-inducing actions, they were not treated more favorably, or there was a difference in DJJS leadership at the time the comparators were disciplined.

Daniel responds generally by citing to his four exhibits to argue that his white co-workers were treated more favorably and that DJJS had a racist culture.  He also argues specifically that McAnally and Joseph Whitaker are sufficiently situated comparators.

In reply, the defendants argue I should not consider any evidence about Whitaker as a comparator because Daniel did not list him as a potential comparator during discovery. Regardless, they argue Whitaker is not similarly situated because although he was absent from work while getting food between shifts, he had authorization to do so, unlike Daniel.  They also argue Daniel did not show Clark County knew about Whitaker's absence, which precludes a finding that he was similarly situated.  With regard to Daniel's argument that McAnally is

1  similarly situated, the defendants argue the Whitaker declaration (upon which Daniel's argument

2  is made) is inadmissible hearsay.  They argue that even if I consider the declaration, McAnally

3  was not similarly situated because DJJS management was composed of different people at the

4  time of McAnally's misconduct, Whitaker did not know whether McAnally was actually

5  disciplined, and the misconduct did not occur during an internal investigation.

6      Title VII makes it unlawful for an employer to discriminate against an employee because

7  of race. 42 U.S.C. § 2000e-2(a)(1).  NRS § 613.330(1)(a) makes the same conduct unlawful

8  under Nevada law.  Title 42 U.S.C. § 1981 "prohibits [racial] discrimination in the 'benefits,

9  privileges, terms and conditions' of employment." *Surrell v. Cal. Water Serv. Co.*, 518 F.3d

10  1097, 1103 (9th Cir. 2008) (quoting 42 U.S.C. § 1981(b)).  I analyze Daniel's Title VII, NRS

11  § 613.330, and § 1981 claims under the same principles and framework. *See id.*; *Apeceche v.*

12  *White Pine Cnty.*, 615 P.2d 975, 977-78 (Nev. 1980).

13      To prove his race discrimination claims, Daniel "must offer evidence that give[s] rise to

14  an inference of unlawful discrimination." *Reynaga v. Roseburg Forest Prod.*, 847 F.3d 678, 690-

15  91 (9th Cir. 2017) (quotation omitted).  One way to establish this inference was set out in

16  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), which requires a plaintiff to

17  show: (1) that they are a member of a protected class; (2) that they were qualified for their

18  position; (3) that they were subjected to an adverse employment action; and (4) that "similarly

19  situated individuals outside [their] protected class were treated more favorably." *Hawn v. Exec.*

20  *Jet Mgmt.*, Inc., 615 F.3d 1151, 1156 (9th Cir. 2010) (quotation omitted).

21      If the plaintiff does this, "the burden shifts to the defendant to provide a legitimate, non-

22  discriminatory reason for the adverse employment action." *Reynaga*, 847 F.3d at 691.  "If the

23  defendant meets this burden, then the plaintiff must . . . raise a triable issue of material fact as to

1  whether the defendant's proffered reasons . . . are mere pretext for unlawful discrimination." *Id.*

2  (quotation omitted, second alteration in original).

3      As an alternative to the *McDonnell Douglas* burden-shifting method, a plaintiff "may

4  simply produce direct or circumstantial evidence demonstrating that a discriminatory reason

5  'more likely than not motivated' the employer." *Id.*  Regardless of the method chosen, "very

6  little evidence" is required for a plaintiff "to survive summary judgment in a discrimination case,

7  because the ultimate question is one that can only be resolved through a searching inquiry—one

8  that is most appropriately conducted by the factfinder, upon a full record." *Reynaga*, 847 F.3d at

9  691 (quotation omitted).

10          *1. Similarly Situated Employees*

11      Individuals are similarly situated when they have similar jobs and display similar

12  conduct. *Vasquez v. Cnty. of L.A.*, 349 F.3d 634, 641 (9th Cir. 2003).  Employees' roles need not

13  be identical, but they must be similar "in all material respects." *Hawn*, 615 F.3d at 1157

14  (quotation omitted).  Materiality depends on context and the facts of the case. *Id.*  Employees in

15  supervisory positions are generally not similarly situated to lower-level employees. *Vasquez*, 349

16  F.3d at 641.  Individuals who received comparable or greater discipline for misconduct do not

17  provide evidence of discrimination. *See Patches v. City of Phx.*, 68 F. App'x 772, 773-74 (9th

18  Cir. May 12, 2003).  Depending on the underlying issues, the presence or absence of a shared

19  supervisor may be relevant to whether employees are similarly situated. *Hawn*, 615 F.3d at 1157-

20  58.

21      Daniel identified eight people as similarly situated comparators.  Chris Stanek was

22  terminated for committing violence against a child, was disciplined for damaging a child's

23  sneakers, and was transferred to a different division for attempting entry into a guard-gated

community, presumably one outside of the detention center, without permission. ECF No. 41 at 86.  James Webb allegedly committed an "abuse of power," used excessive force, threatened detained children, used profanity towards coworkers, and falsified paperwork.[3,4] *Id.*  Brian Conway and Sherry Sovereign were arrested for driving under the influence. *Id.* at 87.  Conway applied for and was granted a transfer to a different department. ECF Nos. 39 at 13; 41 at 112. Sovereign resigned from DJJS in lieu of being disciplined. ECF Nos. 39 at 12; 41 at 110.  Robert Chiodini was charged with a felony and resigned in lieu of a background check. ECF Nos. 39 at 12; 41 at 86.  Kevin Niday filed complaints against his supervisor and was transferred. ECF No. 41 at 86.  These individuals are not similarly situated to Daniel because they did not commit the same type of offenses as Daniel's dishonesty during an internal investigation, insubordination, or absence without leave.

McAnally allegedly used excessive force on children, threatened physical violence against officers and staff, attempted to force subordinates to refer to him as "sergeant," violated children's rights with regard to hygiene in the detention center, and used unapproved equipment. *Id.* at 86-87.  Foremost, McAnally's role as a supervisor makes him not similarly situated to

---

[3] Daniel has not presented evidence whether Webb was disciplined for any of these alleged incidents.

[4] Daniel submitted a declaration by Audrei Parker, a former JPO, who identified Webb and two others as white JPOs who were not disciplined for leaving to get food between double shifts. Daniel did not identify the two other individuals as potential comparators during discovery, so I will not consider them as such. Fed. R. Civ. P. 37(c)(1); ECF No. 41 at 86-87, Interrogatory Answer No. 2.  Daniel also did not identify during discovery that Webb's absence without leave was a basis for his belief that Webb was treated more favorably than him. ECF Nos. 39 at 74 (174:18-176:4); 41 at 86-87, Interrogatory Answer No. 3.  Regardless, Daniel does not present evidence of the basis for Parker's knowledge that Webb was not disciplined, as Parker was a JPO and did not supervise Webb or anyone else.  Daniel also does not present evidence that Webb and Daniel shared the same supervisor or the same decision-maker.  Daniel thus has not presented a genuine issue that Webb is similarly situated.

Daniel in this case. ECF No. 40 at 29-30.  Further, according to Whelihan, there are no sustained allegations that McAnally used excessive force or violence, did not allow children to wash their hands, used unapproved equipment, or related to his use of the term "sergeant." ECF No. 39 at 13.  And these allegations are not the same types of offenses that Daniel committed.  Daniel also alleged McAnally was dishonest to superiors regarding his order that a subordinate use pepper spray and attempted to get a subordinate to lie regarding McAnally's level of certification. ECF No. 58-2 at ¶ 19-20.  According to Whelihan, there are no sustained allegations against McAnally related to the use of pepper spray. ECF No. 39 at 13.

David Carlisle had drug and attendance issues and was terminated for being absent without leave. ECF No. 41 at 86; 96-108.  While Carlisle may have participated in similar conduct, he was not treated more favorably than Daniel.

Daniel did not disclose Joseph Whitaker as a potential comparator during discovery, so I will not consider evidence about him as a potential comparator. Fed. R. Civ. P. 37(c)(1); ECF No. 41 at 86-87, Interrogatory Answer No. 2.

Daniel has not identified any similarly situated individuals who were treated more favorably.  He therefore has not established a prima facie case of race discrimination.

### 2. Legitimate, Non-Discriminatory Reasons for Termination

The defendants argue Daniel was terminated for legitimate, non-discriminatory reasons: insubordination for refusing to follow supervisors' directions, dishonesty during internal investigations, and absence from duty without leave.  The defendants contend these reasons cannot be pretext because they are not internally inconsistent or otherwise not believable. Insubordination and dishonesty are identified grounds for termination, and the finding of

1  misconduct was made after a thorough investigation.  Additionally, Daniel admitted to being

2  absent from work without leave.

3        Daniel responds that he was not insubordinate, and there is a genuine dispute over

4  whether his supervisor directed or merely suggested that he not position himself at the head of

5  the line in the dining hall.  He argues there is circumstantial evidence indicating DJJS's

6  purported reasons are pretext.  He argues McAnally was racist, predisposed to retaliate, and

7  directly involved in the events leading to Daniel's termination.  He argues he was not

8  insubordinate, because he did not cause the diabetic child to pick up the incorrect diet tray.  He

9  had referred to the special diet list prior to entering the dining hall and was not present when the

10 last special-diet children received their trays.  With regard to being absent without leave, Daniel

11 argues he was singled out for getting food between shifts, as officers regularly do so without

12 being disciplined.  He contends DJJS fabricated this reason after their investigation revealed their

13 insubordination claim would not hold up.

14       The defendants reply that Daniel cannot show pretext.  First, they argue Daniel's

15 allegation that McAnally was motivated by discrimination and retaliation is not direct evidence

16 and is neither substantial nor specific circumstantial evidence.  They argue Daniel's

17 discrimination theory is unsupported, as there is no evidence McAnally knew Daniel would

18 ignore his instruction.  They also reiterate that McAnally did not play a role in the decision to

19 terminate Daniel, so the motivations Daniel subscribes to McAnally are immaterial.  They

20 contend that Daniel's proffered excuses for his alleged misconduct do not change the factual

21 bases underlying DJJS's findings of misconduct.

22       A plaintiff may raise a genuine issue of material fact as to pretext through direct evidence

23 of the defendant's discriminatory motive, or through indirect evidence that undermines the

credibility of the defendant's articulated reasons. *See Noyes v. Kelly Servs.*, 488 F.3d 1163, 1170-71 (9th Cir. 2007). "Where the evidence of pretext is circumstantial, rather than direct, the plaintiff must present 'specific' and 'substantial' facts showing that there is a genuine issue for trial." *Id.* at 1170. Still, a plaintiff's burden to raise a triable issue of fact as to pretext is not onerous. *Id.* An employer's changing or supplementing its explanation for an adverse employment action over time does not necessarily indicate pretext if the reasons are consistent and nonconflicting. *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1063 (9th Cir. 2002).

An employer's true reasons for terminating an employee "need not necessarily have been wise or correct, as long as they are not discriminatory." *See Merrick v. Hilton Worldwide, Inc.*, 867 F.3d 1139, 1147 (9th Cir. 2017) (citation and internal quotations omitted); *see also Villiarimo*, 281 F.3d at 1063 (reasoning that courts only require employers honestly believe their reasons for the employment action, even if the reason is foolish or baseless). An employee's failure to follow a direct order, dishonesty during an investigation, and being absent without leave have been found to be legitimate, non-discriminatory reasons for adverse employment actions. *See Vasquez*, 349 F.3d at 641 (failure to follow a direct order is legitimate reason for adverse employment action); *Villiarimo*, 281 F.3d at 1062-63 (dishonesty during investigation is legitimate reason for adverse employment action); *Greene v. Gen. Elec. Co.*, 857 F.2d 1477, 1477 (9th Cir. 1988) (absence without leave is legitimate reason for adverse employment action); *Dumas v. New United Motor Mfg., Inc.*, 305 F. App'x 445, 448 (9th Cir. Dec. 29, 2008) (finding employer's terminating plaintiff for violating company policy requiring permission for extended leaves of absence to be legitimate).

Even if Daniel could establish a prima facie case of discrimination, the defendants proffered three legitimate, non-discriminatory reasons for terminating him: he was dishonest

during an internal investigation, did not follow a direct order,[5] and was absent from work without leave.  Daniel challenges the propriety of his termination for failing to read from the special diet list while at the front of the serving line because he read it prior to enter the dining hall.  But he presents no evidence that the defendants did not have an honest belief in their non-discriminatory reason for terminating him.  His argument that McAnally is racist does not rise to the level of the "specific" and "substantial" evidence needed to show pretext, especially given that McAnally was not involved in the decision to terminate Daniel. ECF No. 40 at 87-89; 94.

Daniel has not shown that the defendants' reasons were pretext.  The defendants' supplementing their decision to terminate Daniel due to insubordination and dishonesty with the fact that he was absent without leave does not show pretext because these reasons are neither conflicting nor inconsistent.  Daniel argues that it was commonly accepted for officers to leave briefly between shifts to get food, but he has not presented evidence from DJJS supervisors that they were aware JPOs left to get food between shifts, or that they did not discipline JPOs for doing so. *See* ECF 40 at 97-99.  Daniel has presented evidence of only a single JPO who had first-hand experience of not being disciplined for getting food between shifts. ECF No. 58-3 at 8. This is neither specific nor substantial enough to present a genuine issue of pretext.

*3. Summary*

Daniel has not established that there were similarly situated individuals who were treated more favorably than him.  Even if he had, Daniel has not demonstrated pretext for the

---

[5] Even assuming there is a genuine dispute whether the supervisor's direction to not work the front of the serving line was an order or a mere suggestion, Daniel has not presented evidence disputing that the defendants were honest in their belief that the direction was an order that Daniel violated.  Further, that dispute is ultimately not material because the defendants found Daniel violated McAnally's undisputed order when he did not read from the special diet list while at the head of the serving line.

1 defendants' three legitimate, non-discriminatory reasons for terminating him.  I therefore grant

2 the defendants' motion for summary judgment on Daniel's race discrimination claims brought

3 under Title VII, NRS § 613.330, and 42 U.S.C. § 1981.

4     **B. Retaliation Claims**

5        The defendants argue they are entitled to summary judgment on Daniel's retaliation

6 claims.  First, they argue the only protected activity Daniel engaged in was filing his prior

7 lawsuit.  They contend that his internal complaints to DJJS personnel cannot be considered

8 protected activity because his complaints were not based on race-based comments or actions.

9 Next, they argue that the only adverse employment action relevant for a retaliation claim is

10 Daniel's termination.  Daniel was subject to no greater supervision than any other DJJS

11 employee, and managers' responses to his complaints do not qualify as adverse employment

12 actions.  The defendants argue the time-period between the prior lawsuit and termination is too

13 remote to infer causation, and no parties to the prior lawsuit participated in the decision to

14 terminate Daniel.  Finally, the defendants argue they had legitimate, non-retaliatory reasons to

15 terminate Daniel.

16        Daniel responds that his (1) filing a charge with the EEOC and Nevada Equal Rights

17 Commission related to his 2016 lawsuit and (2) filing his 2016 lawsuit are both protected

18 activities.  He claims he experienced numerous adverse employment actions, such as being

19 falsely accused of transgressions, being held to a different standard than other employees, being

20 terminated, and being subject to McAnally's increased scrutiny, antagonism, and retaliatory

21 harassment.  He contends DJJS's toleration of McAnally's retaliatory harassment is also an

22 adverse employment action.  Daniel argues a jury could reasonably infer causation based on the

23

six-month period between the settlement and McAnally's increased harassment.[6]  He also argues

McAnally's intimate involvement in the decision to terminate him invokes the "cat's paw"

theory.  He contends there are disputed material facts regarding McAnally's motivations for

harassment and DJJS's response to his complaints.  Daniel finally argues the defendants'

purportedly legitimate reasons for terminating him are pretext.[7]

In reply, the defendants argue I should measure any timing as between the filing of the

prior lawsuit and any adverse employment action, and such timing does not support an inference

of causation.[8]  In response to Daniel's argument that retaliation may consist of harassment, the

defendants argue the only factual incident involving McAnally following Daniel's prior lawsuit

is McAnally's instruction to Daniel to read the special diet list at the head of the serving line.

They contend that because this is a job-related instruction which was given to others and is

consistent with directions given at supervisor meetings, it cannot support a retaliatory harassment

charge.

Title VII makes it unlawful "for an employer to discriminate against any of [its]

employees . . . because [they have] opposed any practice made an unlawful employment practice

by this subchapter." 42 U.S.C. § 2000e-3(a).  Section 1981 also encompasses employment

retaliation claims. *CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 457 (2008).  The legal

---

[6] Daniel also seems to argue that only six months passed between the settlement agreement in February 2017 (ECF No. 45 at 73-74) and his January 2018 termination (ECF No. 39 at 36, 22:13).  Because eleven months passed between these events, Daniel's arguments regarding a six-month time frame do not apply and I do not consider them in this context.

[7] Daniel relies on the same pretext arguments in the context of his retaliation and race discrimination claims.

[8] The defendants rely on their same response to Daniel's pretext argument in the context of his retaliation and race discrimination claims.

1  principles governing a § 1981 retaliation claim and a Title VII retaliation claim are the same.

2  *Manatt v. Bank of Am., NA*, 339 F.3d 792, 797 (9th Cir. 2003).[9]

3          To establish a prima facie case of retaliation, a plaintiff must prove: (1) they engaged in a

4  protected activity, (2) they suffered an adverse employment action, and (3) there was a causal

5  connection between the two. *Bergene v. Salt River Project Agric. Improvement and Power Dist.*,

6  272 F.3d 1136, 1140-41 (9th Cir. 2001).  Once the plaintiff establishes a prima facie case, the

7  burden of production shifts to the employer "to present legitimate reasons for the adverse

8  employment action." *Brooks v. City of San Mateo*, 229 F.3d 917, 928 (9th Cir. 2000).  If the

9  employer meets its burden, the plaintiff must then "demonstrate a genuine issue of material fact

10  as to whether the reason advanced by the employer was a pretext" for retaliation. *Id.*

11          Title VII protects only those employees who oppose what they reasonably believe is

12  discrimination under Title VII. *Learned v. City of Bellevue*, 860 F.2d 928, 932 (9th Cir. 1988).

13  That is, opposed conduct must fall within Title VII's protection to sustain a claim of unlawful

14  retaliation. *Id.*

15          "An action is cognizable as an adverse employment action if it is reasonably likely to

16  deter employees from engaging in protected activity." *Ray v. Henderson*, 217 F.3d 1234, 1243

17  (9th Cir. 2000).  Obviously, termination can constitute an adverse employment action. *Brooks*,

18  229 F.3d at 928.  Harassment as retaliation for engaging in protected activity may also constitute

19  an adverse employment action, but it is actionable only if it creates a hostile work environment

20  that is "sufficiently severe or pervasive to alter the conditions of the victim's employment and

21

22  [9] Both parties present arguments regarding a retaliation claim under NRS Chapter 613.  Daniel does not bring such a claim in his SAC.  To the extent I should consider such a claim, the legal

23  principles governing it are the same as those that govern Daniel's Title VII and § 1981 retaliation claims, and my analysis and decision would be the same. *See Pope v. Motel 6*, 114 P.3d 277, 281 (Nev. 2005).

create an abusive working environment." *Ray*, 217 F.3d at 1244-45.  Aggressive or embarrassing performance-related comments made by a supervisor to an employee do not necessarily support a hostile work environment claim. *See Surrell*, 418 F.3d at 1108-09.

"To show the requisite causal link, the plaintiff must present evidence sufficient to raise the inference that [their] protected activity was the likely reason for the adverse action." *Cohen v. Fred Meyer, Inc.*, 686 F.2d 793, 796 (9th Cir. 1982).  "The causal link can be inferred from circumstantial evidence such as the employer's knowledge of the protected activities and the proximity in time between the protected activity and the adverse action." *Dawson v. Entek Int'l*, 630 F.3d 928, 936 (9th Cir. 2011).  To establish a genuine issue of material fact on causation, a plaintiff must show that the particular person who committed the adverse employment action was aware of the protected activity. *See Raad v. Fairbanks N. Star Borough Sch. Dist.*, 232 F.3d 1185, 1197 (9th Cir. 2003).  But under the "cat's paw metaphor," even if the final decision maker lacked retaliatory intent, the plaintiff can establish the causal link by "proving that [a] biased subordinate influenced or was involved in the decision or decision-making process." *France v. Johnson*, 795 F.3d 1170, 1176 (9th Cir. 2015), *as amended on reh'g* (Oct. 14, 2015) (internal quotations omitted).

Temporal proximity between an employer's knowledge of protected activity and an adverse employment action must be "very close" to hold the proximity alone as sufficient evidence of causality. *Clark Cnty. School Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001).  While there is no set time-period beyond which acts cannot support an inference of retaliation, the Ninth Circuit has held that periods as short as five months and as long as almost 18 months cannot alone support an inference of retaliation. *Brown v. Dep't of Public Safety*, 446 F. App'x 70, 73-74 (9th Cir. July 29, 2011); *Villiarimo*, 281 F.3d at 1065.

The only protected activities Daniel engaged in are filing his EEOC complaint in May 2016 and filing his prior lawsuit in August 2016, not settling the lawsuit in February 2017. *See Pratt v. Hawaii, Dept. of Public Safety*, 308 F. Supp. 3d 1131, 1148 (D. Haw. 2018) (date of protected activity is when plaintiff filed lawsuit, not when it settled). Daniel's termination in January 2018 is an adverse employment action. The 17 months between the filing of the lawsuit and the termination are too remote in time to infer causation. All the more so, the filing of his EEOC complaint in May 2016 and his termination 20 months later are too remote to infer causation. Further, Daniel does not raise a genuine issue of fact about whether McAnally influenced the decision to terminate Daniel. Even viewing Daniel's allegation that McAnally met with kitchen staff to corroborate their stories in the light most favorable to him, Daniel has not presented evidence that McAnally interfered in Whelihan's decision to terminate him in any way. Unlike other "cat's paw" cases, there is no evidence McAnally played a role in the decision-making process that resulted in Daniel's termination. *Compare Poland v. Chertoff*, 494 F.3d 1174, 1183-84 (9th Cir. 2007) (employee's retaliatory intent imputed to employer where employee initiated administrative inquiry, submitted lengthy memo outlining acts of malfeasance, provided names of witnesses for inquiry panel, and provided panel with other employee's notes on plaintiff's performance).

Daniel also argues he endured retaliatory harassment, which constitutes an adverse employment action. Daniel seems to argue that the harassment detailed in the internal complaints was orchestrated by McAnally and was retaliatory. There is evidence McAnally was involved in only a few incidents detailed in the complaints: that McAnally was rude and unaccommodating, that McAnally asked Daniel why he did not have a radio, and McAnally's August 17 kitchen order. Daniel has not raised a genuine issue that McAnally orchestrated each

1 incident underlying his complaints because he has not presented evidence that McAnally was

2 involved in any of the other incidents.

3      Even if I consider every instance about which Daniel complained, without regard to

4 whether McAnally was involved (as well as McAnally's August 2017 kitchen order), these

5 instances do not rise to the level of a hostile work environment.  Daniel complained that

6 (1) Codebo told a child in line that Daniel needed to tell Codebo about the child's allergies,

7 (2) Ochoa requested to speak with Daniel privately, and (3) McAnally asked him why he did not

8 have a radio.  These are all work-related interactions.  They do not support a hostile work

9 environment claim because they are performance-related comments. *See Surrell*, 518 F.3d at

10 1108-09 (supervisor's comments, often in front of others, that plaintiff failed to perform an

11 aspect of her job, failed to pay attention, caused the company to lose money, and, on multiple

12 occasions, that she was too slow with her work were not sufficiently severe or pervasive to

13 sustain hostile-work-environment claim); *Haughton v. Brennan*, No. 3:15–cv–00888–HZ, 2016

14 WL 4216778, at *6 (D. Or. Aug. 8, 2016) (finding allegations of work-related incidents and

15 comments described little more than a series of fractious interpersonal conflicts outside Title VII

16 protection).

17      Taken as a whole, the other incidents (a rumor that a director stated Daniel was a bad

18 influence, a rumor that Daniel and a co-worker had an interpersonal issue, an allegation that two

19 officers conspired to get Daniel in trouble, and an incident in which Webb cursed at Daniel) are

20 not sufficiently severe to constitute a hostile work environment. *See Hardage v. CBS Broad.,*

21 *Inc.*, 427 F.3d 1177, 1189 (9th Cir. 2005) (general manager's snide remarks and threats

22 insufficiently severe to alter conditions of employment and create abusive work environment);

23 *Kortan v. Cal. Youth Auth.*, 217 F.3d 1104, 1112 (9th Cir. 2000) (supervisor's decreasing

civility, hostile stares, and being hyper-critical of employee's performance were insufficient to preclude summary judgment against employee).

And even if Daniel had demonstrated a hostile work environment, he does not present evidence sufficient to raise the inference that his prior lawsuit or EEOC complaint were the likely reasons for the harassment.  The filing of Daniel's prior complaint in August 2016 and the first evidence of harassment six months later, in March 2017, are too remote in time to alone infer causation.  Likewise, the filing of his EEOC complaint in May 2016 and the first evidence of harassment 10 months later are also too remote to alone infer causation.  Daniel has not presented any other arguments or evidence to infer causation.[10]  Further, Daniel has not presented any evidence that certain employees involved in the allegedly retaliatory harassment (such as Webb, Ochoa, or Codebo) were aware of Daniel's prior lawsuit.  Daniel has not shown that the retaliatory harassment was caused by his filing the lawsuit or the EEOC complaint.

Daniel has not presented a genuine issue of material fact on his retaliation claims.  I therefore grant the defendants' motion for summary judgment on these claims.

### C.  42 U.S.C. § 1983 Claim

Daniel alleges that DJJS has a custom or policy to not promote African-Americans.  He also claims that DJJS lumps together charges of misconduct against African-Americans, instead of addressing such charges individually.  The defendants argue that Daniel agreed during his deposition that DJJS promotes some African-Americans.  They also contend that DJJS's practice of consolidating allegations of misconduct is not unique to African-Americans.  Daniel responds that a reasonable jury could find that Clark County's policies, procedures, and customs violated

---

[10] Daniel's only causation argument is that McAnally's August 17 harassment and Daniel's resulting discharge were in retaliation for his settling his prior lawsuit.  I explained above that the time-period between these events does not alone infer causation.

his right to his DJJS employment.  In reply, the defendants note that Clark County cannot be liable under respondeat superior.  They also argue Daniel failed to raise an issue of fact on this claim and failed to identify any custom or policy at issue.

Section 1983 provides a mechanism for the private enforcement of substantive rights conferred by the U.S. Constitution and federal statutes. *Graham v. Connor*, 490 U.S. 386, 393-94 (1989).  Section 1983 "'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Id.* (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)).

"Generally, a municipality is liable under *Monell* only if a municipal policy or custom was the 'moving force' behind the constitutional violation. . . .  In other words, there must be 'a direct causal link between a municipal policy or custom and the alleged constitutional deprivation.'" *Villegas v. Gilroy Garlic Festival Ass'n*, 541 F.3d 950, 957 (9th Cir. 2008) (citation omitted).  A plaintiff may establish *Monell* liability under § 1983, as Daniel alleges, by showing that:

> (1) conduct pursuant to an official policy inflicted the injury; (2) the constitutional tort was the result of a longstanding practice or custom which constitutes the standard operating procedure of the local government entity; (3) the tortfeasor was an official whose acts fairly represent official policy such that the challenged action constituted official policy; or (4) an official with final policy-making authority delegated that authority to, or ratified the decision of, a subordinate.

*Price v. Sery*, 513 F.3d 962, 966 (9th Cir. 2008) (internal quotation marks and citations omitted).

Though Daniel alleges DJJS promoted only certain types of African-American people, he admitted that DJJS does promote African-Americans. ECF No. 39 at 72 (167:22-168:24).  And he does not refute DJJS's evidence that its policy of consolidating multiple findings of misconduct into a single disciplinary proceeding is not unique to a particular race. *Id.* at 14.

1  Daniel has not raised a genuine issue of material fact on whether these, or any other custom or

2  policy, violated his constitutional rights.  I therefore grant the defendants' motion for summary

3  judgment on Daniel's claim brought under 42 U.S.C. § 1983.

4      **D.  Hostile Work Environment Claim**

5      The defendants argue Daniel has not identified any race-based comments or objectively

6  offensive conduct to support a hostile work environment claim.  Daniel does not respond to this

7  argument.

8      To establish a hostile work environment claim based on race, a plaintiff must show that

9  (1) they were subjected to verbal conduct of a racial nature; (2) the conduct was unwelcome; and

10  (3) the conduct was sufficiently severe or pervasive to alter the conditions of their employment

11  and create an abusive work environment. *See Vasquez,* 349 F.3d at 642; *Manatt*, 339 F.3d at 798.

12      Daniel has not shown a genuine issue of material fact on whether he was subject to

13  conduct of a racial nature because he has not identified any race-based conduct or statements.  I

14  therefore grant the defendants' motion for summary judgment on Daniel's hostile work

15  environment claim brought under 42 U.S.C. § 1981.

16      **E.  Claims Against Individual Defendants**

17      Daniel brings claims against John and McAnally under 42 U.S.C. §§ 1981 and 1983.  The

18  defendants argue that neither John nor McAnally personally participated in the decision to

19  terminate Daniel, and that McAnally did not participate in any racial discrimination.  With regard

20  to Daniel's "cat's paw" theory against McAnally, they contend Daniel has not presented

21  sufficient admissible evidence to support this theory.  And they argue John was not grossly

22  negligent by delegating the termination decision to Whelihan, and John was not aware of any

23  civil rights violations at the time he delegated the decision.  Finally, the defendants argue John

1   and McAnally are entitled to qualified immunity because they did not participate in the

2   termination decision and, even if they did, no precedent demonstrates their conduct violated

3   clearly established rights.

4        Daniel responds that John and McAnally are individually liable under § 1981 for their

5   own actions.  Daniel argues qualified immunity does not apply because it is well-established that

6   managers cannot engage in discrimination or retaliation.  The defendants reply that Daniel's

7   argument is contrary to controlling authority that clearly established law should not be defined at

8   a high level of generality.  They note Daniel did not cite any case law that John's accepting the

9   termination decision or McAnally's asking him to read off the diet list violates Daniel's rights.

10       To be liable under § 1983, a defendant must have personally participated in the alleged

11   misconduct. *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).  There is no respondeat superior

12   liability under § 1983. *Id.*  Thus, a supervisor cannot be liable merely because a subordinate

13   engaged in illegal behavior.  Rather, a supervisor is liable under § 1983 for a subordinate's

14   constitutional violations only "if the supervisor participated in or directed the violations, or knew

15   of the violations and failed to act to prevent them." *Id.*  Individuals may be liable under § 1981 as

16   well. *Flores v. City of Westminster*, 873 F.3d 739, 753 n.6 (9th Cir. 2017).  As in § 1983

17   individual liability claims, individual liability under § 1981 must be predicated on an individual's

18   personal involvement. *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 75 (2d Cir.

19   2000).

20       Daniel's § 1981 and § 1983 against John and McAnally fail for the same reasons I

21   discuss above.  Daniel offers no evidence that John or McAnally personally participated in

22   discrimination or retaliation, and he does not present a genuine issue that there was any such

23

conduct.  I therefore grant the defendants' motion for summary judgment on Daniel's claims brought against John and McAnally under 42 U.S.C. §§ 1981 and 1983.

I THEREFORE ORDER that the defendants' motion for summary judgment **(ECF No. 48) is GRANTED.**  The clerk of court is instructed to enter judgment in favor of the defendants and against the plaintiff, Daniel Martin, and to close this case.

DATED this 22nd day of December, 2021.

ANDREW P. GORDON
UNITED STATES DISTRICT JUDGE